**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PHILLIP G. ELLIOTT,** | : | |
| **Plaintiff** | : | **No. 2:16-cv-00145** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **EQT CORPORATION and** | : | |
| **EQT CORPORATION SEVERANCE** | : | |
| **PAY PLAN,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Before the Court is Defendants EQT Corporation ("Defendant EQT") and EQT

Corporation Severance Pay Plan ("Defendant Pay Plan")'s motion for summary judgment.[1]

(Doc. No. 41.) For the reasons that follow, the Court will grant in part and deny in part the

motion.

## I.    BACKGROUND

### A.    Factual Background[2]

#### 1.    General Details of Plaintiff's Employment and Relevant Documents

Plaintiff Phillip Elliott ("Plaintiff") was employed by Defendant EQT from March of

1997 until 2015, beginning as a business analyst and subsequently receiving various promotions.

(Doc. No. 53 ¶¶ 1-2.) Specifically, in 2010, Plaintiff was promoted to the position of Treasurer,

and in this capacity, Plaintiff reported to Philip Conti ("Mr. Conti"), who at that time served as

---

[1] When referring to these defendants together, the Court uses the term "Defendants" herein.

[2] The Court's factual recitation is derived from Defendants' reply to Plaintiff's counterstatement of material facts and additional material facts (Doc. No. 53), which includes Defendants' initial statement of material facts (Doc. No. 43), Plaintiff's counterstatement and additional facts (Doc. No. 49), and Defendants' replies thereto, which contain specific citations to the record at each numbered paragraph. Unless otherwise noted, the facts included herein are deemed undisputed. Additionally, in other instances, including instances in which the parties dispute certain facts, the Court refers directly to the portion of the record that supports a given factual assertion.

Defendant EQT's Chief Financial Officer ("CFO"). (Id. ¶ 4.) In 2013, Plaintiff was then promoted to Senior Vice President of Strategic Planning, Land, and Commercial Analysis for EQT's Midstream Business ("EQT Midstream"). (Id. ¶ 5.) EQT Midstream – a subsidiary of Defendant EQT – deals mainly with "gathering and transporting primarily natural gas and then redistributing the product to a variety of different markets throughout the United States." (Id. ¶ 6.)

At the time Plaintiff was promoted to Senior Vice President for EQT Midstream, Conti acted as "CFO for the entire company, including for EQT Midstream." (Id. ¶ 7.) At this time, EQT Midstream's CEO was David Porges ("Mr. Porges"). (Id.) In his capacity as Senior Vice President for EQT Midstream, Plaintiff reported to Randy Crawford ("Mr. Crawford"), who served as the President of EQT Midstream at that time. (Id. ¶ 5.) Mr. Crawford, in turn, reported to Mr. Porges. (Id. ¶ 8.) For the calendar year 2013, Mr. Conti and Mr. Crawford evaluated Plaintiff's performance, and in doing so, gave Plaintiff a favorable review. (Id. ¶ 9.) Plaintiff similarly received a favorable performance review for the calendar year 2014, during which time Mr. Crawford evaluated Plaintiff. (Id. ¶ 10.)

At all relevant times, Defendant EQT had in place "an ERISA-governed welfare benefit plan" (the "Plan"), which "is part of the EQT Corporation Comprehensive Welfare Plan for Unfunded Benefits." (Id. ¶ 68.) In pertinent part, the Plan "provides severance benefits to eligible employees whose employment is terminated by [Defendant] EQT as a result of": (1) "full or partial shutdown of a facility, department or other business unit"; (2) "position elimination due to reorganization or lack of work"; (3) "sale and/or consolidation of business units"; or (4) "other circumstances, such as performance reasons, which merit payment of severance benefits as determined by [Defendant] EQT in its sole discretion." (Id. ¶ 69.)

Additionally, the Plan "states that no benefits shall be payable to a Participant whose termination of employment is the result of, among other things, a 'voluntary resignation or retirement by such Participant.'" (Id. ¶ 70).

Pursuant to the Plan, the Plan Administrator and Appeals Committee are given "complete discretionary authority . . . to, among other things, determine eligibility for benefits in accordance with the provisions of the Plan and to construe the Plan." (Id. ¶ 77.) Such authority "includes the ability to determine whether a claimant is eligible for benefits, as well as the time, manner, and mode of distribution." (Id.) Furthermore, the Plan expressly states the following:

> [T]he Appeals Committee will act as trier of fact and thereby shall have the power and full discretionary authority to determine facts and to apply the same to the Claim. In making a determination as to any Claim which involves an interpretation of the terms of the Plan, the Appeals Committee in the exercise of its discretion shall have the authority to determine the intent of the Company in its establishment of the Plan . . . The decision of the Appeals Committee shall be final and conclusive as to all facts and all interpretations of the terms of the Plan, its operations, and the benefits intended to be provided and shall not be reversed unless found by a court of competent jurisdiction to be arbitrary and capricious.

(Id. ¶ 78) (alteration and omission in original).

In addition, Plaintiff and Defendant EQT previously "entered into a Confidentiality, Non-Solicitation and Non-Competition Agreement . . . as of September 8, 2008, which was amended twice" and "provide[d] 12 months of payments at [] Plaintiff's base salary and certain benefits if his employment with [Defendant] EQT is terminated by [Defendant] EQT for any reason other than 'Cause' or if Plaintiff terminated his employment . . . for 'Good Reason.'" (Id. ¶ 80).[3] The Non-Compete Agreement defined "Good Reason" as: "termination of employment by the Employee within ninety (90) days after: (i) being demoted, or (ii) being given notice of a reduction in his or her annual base salary (other than a reduction of not more than 10%

---

[3] The Court refers to this agreement as the "Non-Compete Agreement" herein.

applicable to all senior officers of the Company)." (Id. ¶ 81.) Additionally, the Non-Compete

Agreement defined "Cause" as follows: "(i) the conviction of a felony, a crime of moral

turpitude or fraud or having committed fraud, misappropriation or embezzlement in connection

with the performance of his duties hereunder, (ii) willful and repeated failures to substantially

perform his assigned duties; or (iii) a violation of any provision of this Agreement or express

significant policies of the Company." (Doc. No. 44-1 at 104.)

### 2. Events Surrounding the End of Plaintiff's Employment with Defendant EQT

While employed as the Senior Vice President of EQT Midstream, Plaintiff hoped "that at

some point in the then near future that [Mr. Porges] would approve appointing a CFO of its own

for EQT Midstream, rather than having the CFO of [Defendant] EQT serve as the CFO for EQT

Midstream." (Doc. No. 53 ¶ 11.) Plaintiff – who ultimately sought the position of CFO as a

career goal – "wanted a clear path to becoming CFO of EQT Midstream." (Id. ¶¶ 15-16.) Mr.

Crawford informed Plaintiff "that he would push to get Plaintiff appointed as CFO of EQT

Midstream and that if he were unsuccessful in doing so, he [] would 'package' Plaintiff out of

EQT" in the event Plaintiff no longer sought to remain an EQT employee. (Id. ¶ 12.) Plaintiff

understood the term "package out" to mean he would be provided with a severance package

upon the end of his employment with Defendant EQT. (Doc. No. 44-1 at 58:8-16, 100.)

In the course of his employment with Defendant EQT, Plaintiff had various discussions

with Mr. Crawford in which he made known his desire to advance to a CFO position. Plaintiff

stated that he and Mr. Crawford had several conversations about Plaintiff being "packaged out"

of the company during the fall of 2014. (Id. at 19:6-16.) Specifically, Mr. Crawford testified

that around late 2014, Plaintiff informed him that he sought the position of CFO with a

corporation generally or with EQT Midstream – and that "he felt that he deserved that [position]

and he wanted to move into that position." (Doc. No. 44-2 at 10:4-9.) Mr. Crawford further

testified that in response, he informed Plaintiff that he "didn't believe the corporation was

prepared to name him to that position at this time, but [he] would take it further up and make it

known that that's what [Plaintiff] would like to be able to achieve currently, at that time." (Id. at

10:10-14.) Mr. Crawford then relayed this information to Mr. Porges, who, according to Mr.

Crawford, "ultimately makes that decision" and "took it under advisement and considered it."

(Id. at 10:21-22, 11:2-3.)

Following this conversation with Plaintiff, Mr. Crawford had a discussion with Mr.

Porges in which Mr. Porges informed him "that the corporation wasn't ready at this point in time

to make a change in the CFO role and that it just wasn't, at this time, the opportunity [for

him] . . . to make that change" and, accordingly, Mr. Crawford communicated that information to

Plaintiff. (Id. at 11:23-25, 12:1-2.)[4] In so doing, Mr. Crawford advised Plaintiff "[t]o be

patient[,]" adding that the company thought highly of Plaintiff and had favorable views as to his

work performance. (Id. at 13:14-17.) Plaintiff described his reaction to learning such

information from Mr. Crawford as follows: "Well, Mr. Crawford informed me, but we had had

discussions prior to Mr. Crawford having that conversation with Mr. Conti and Mr. Porges, so

my reaction was exactly what he had promised me prior, which was if I can't make this happen,

then I will package you out. I will, you know, help you leave the organization." (Doc. No. 44-1

at 17:19-25.) According to Plaintiff, after learning that the EQT leadership were not inclined to

---

[4] While it appears that the exact date on which this conversation took place is unclear from the
record, the Court observes that Mr. Crawford testified that Plaintiff made him aware of his desire
to take on a CFO position in either late 2014 or early 2015 (Doc. No. 44-2 at 10:4-5), and he
informed Mr. Porges of this information shortly thereafter. In addition, the Court notes that
based on the relevant deposition testimony, it is unclear whether Mr. Crawford's conversation
with Mr. Porges included only Mr. Crawford and Mr. Porges, or if it included Mr. Conti, as well.
(Doc. No. 44-1 at 17:7-12.)

create a CFO position for EQT Midstream, Plaintiff and Mr. Crawford agreed that Mr. Crawford would communicate with Human Resources on behalf of Plaintiff "right after the bonus awards [were administered] in February [of the next year] and that [Mr. Crawford]" would effectively transition [Plaintiff] out of the position and we could all be happy." (Id. at 22:18-22.) Mr. Crawford then conveyed this information to Charlene Petrelli ("Ms. Petrelli"), Defendant EQT's Chief Human Resources Officer. (Doc. No. 44-2 at 14:21-24.)

In December of 2014, Plaintiff completed work on EQT Midstream's 2015 business plan, which was scheduled to be presented that same month. (Doc. No. 44-1 at 57:11-15.) Subsequently, in January of 2015, Plaintiff began looking for employment outside of EQT, testifying that around this time, Mr. Crawford had indicated to him that there was "no reason" and "no purpose" for Plaintiff to attend certain EQT meetings, which Plaintiff testified was the result of Mr. Crawford's intent to "package [Plaintiff] out" upon the end of his employment with Defendant EQT. (Id. at 57:20-25, 58:1-8.) According to Plaintiff – who did not explicitly inform Mr. Crawford that he would not resign from his position absent some sort of severance package (id. at 58:18-21) – this belief was due to what Plaintiff described as Mr. Crawford's "representation . . . that he would package [Plaintiff] out" (id. at 58:14-17). Relatedly, Plaintiff testified that his work responsibilities generally diminished from late 2014 to early 2015, commenting that his workload was reduced to that of having "zero responsibilities" by March of 2015. (Doc. No. 53 ¶¶ 92, 95.)

In February of 2015, Plaintiff had become aware of an employment opportunity as a CFO with an entity known as Miller Energy Resources ("Miller Energy") in Houston, Texas by means of a search firm. (Id. ¶ 23.) Plaintiff traveled to Houston to interview with Miller Energy in late February of 2015, and he traveled again to Houston in March for additional interviews. (Id.

¶¶ 24-25.)  At this time, Plaintiff had not informed anyone at Defendant EQT that he was

pursuing this employment opportunity.  (Id. ¶ 25.)  Plaintiff testified, though, that Mr. Crawford

was "well aware that [he] was looking for work."  (Doc. No. 50-1 at 7.)[5]  On approximately

March 19, 2015, Plaintiff received an offer for the CFO position with Miller Energy, which

Plaintiff accepted on March 25, 2015, along with entering into an employment agreement and

accepting a starting salary of $345,000.  (Doc. No. 53 ¶¶ 26-27.)  Plaintiff's employment with

Miller Energy was scheduled to begin on April 6, 2015, and Plaintiff eventually began his new

employment on that date.  (Id. ¶ 28.)

Prior to receiving the offer of employment from Miller Energy and accepting the offer,

on March 6, 2015, Plaintiff contacted Dave Smith ("Mr. Smith"), Defendant EQT's Director of

Compensation and Benefits, stating, in relevant part, the following: "Dave – Randy was

supposed to reach out to you.  Let me know when you have time to talk."  (Doc. No. 44-1 at 86.)

In response, Mr. Smith replied that Mr. Crawford had not contacted him and that he would let

Plaintiff know when Mr. Crawford contacted him.  (Id.)  Plaintiff then forwarded this email

---

[5] On a similar note, Mr. Porges testified in his deposition, in pertinent part, as follows:

> Q.  If you tell somebody – not Elliott necessarily, but anybody – help us out if we
> need some help in the transition, you don't have to come down, say hi, we're
> always happy to see you, would you expect them to be out looking for work
> during that time period?

> A.  I would expect that they would be looking – yeah.  At that point, I would think
> at least they were pondering it.  It's not always the case.  A number of times, what
> happens is they'll say I don't want to look for work right away. . . . They wind up
> looking for work subsequently, but that's only my experience of specific
> individuals.

(Doc. No. 50-2 at 6.)

conversation to Mr. Crawford and stated: "Randy – thanks for the help here. I sincerely appreciate it." (Id.) Shortly thereafter, on March 10, 2015, Plaintiff again reached out to Mr. Smith via email to request a meeting with him, and in so doing, stated "Dave – as you probably appreciate, I am a bit anxious. Sorry to keep bugging you – I hope you understand. Could we meet on Thursday?" (Id. at 87.) Mr. Smith responded as follows:

> I put together all of the relevant information for [Ms. Petrelli] and we reviewed the information. [Ms. Petrelli] is getting on [Mr. Crawford's] calendar to review any issues he has. She wants to meet with you after she meets with [Mr. Crawford]. I understand that you want to move forward and can appreciate that this is an anxious time. My hands are tied as she wants to meet with you herself.

(Id.) Plaintiff understood that Mr. Smith reported to Ms. Petrelli, who, in turn, reported to Mr. Porges, who was considered to have authority regarding any potential package or the ability to set benefits for Plaintiff. (Doc. No. 53 ¶ 33.)

Plaintiff subsequently sent an email to Mr. Crawford on March 12, 2015, stating, in pertinent part: "Randy – I would like to put a number of vacation days on my calendar, which will undoubtedly raise questions from my direct reports. Would it be okay to tell them what is going on?" (Doc. No. 44-1 at 88.) Mr. Crawford replied by saying that he had attempted to contact Ms. Petrelli, who was on vacation until March 23, and also noted that he was "not comfortable telling the organization at this point" but adding that he had "no problem with [Plaintiff] taking vacation." (Id.) Plaintiff then took vacation days for the remainder of the month of March. (Doc. No. 53 ¶ 36.) Plaintiff purportedly utilized his remaining vacation time as a result of his belief that his job responsibilities at Defendant EQT had been reeducated to the point of being effectively eliminated. (Doc. No. 44-1 at 96.) During this time, Plaintiff was also pursuing the Miller Energy position, as described supra, which entailed traveling to Houston. (Id. at 39:18-21.)

On March 25, 2015 – the same date Plaintiff accepted his new employment with Miller Energy as its CFO (Doc. No. 53 ¶¶ 26-27) – Plaintiff sent an email message to Ms. Petrelli, which reads as follows:

> Charlene – Randy [Crawford] informed me of your discussion and of the upcoming discussion with Dave Porges on Monday March 30th. Randy has given me permission to take vacation (basically until I am out of days) and I do not plan on being in the office until Monday. I assume the release will be the standard release so I will not have any issues with it. If there is anything you can share to make my review easier, that would be great. If not, I can review after you meet with Dave. I would like to keep my phone number and I understand that it is typically acceptable.
>
> I am very comfortable with my last day being any day between now and April 3rd. If we could schedule time on Monday for an exit interview and to review any documentation, I would appreciate it. Thanks.

(Doc. No. 44-1 at 89.) In response, Ms. Petrelli sent the following message to Plaintiff via email:

> As I do not have Dave's approval to offer you anything, I cannot commit to having an agreement ready for Monday. I do not know what you mean by "standard release," but I expect that you will be required to honor the terms of your current non-compete agreement PLUS agreeing to a non-solicitation period of three years.
>
> Also at this time, I cannot commit to your last day being on or before April 3. If this does not work for you, you are free to resign.

(Id.) In response, Plaintiff stated: "Thanks for your note. I completely understand. I, of course, will honor all of my agreements. I look forward to seeing you next week. Thank you." (Doc. No. 44-1 at 90.)

Ms. Petrelli communicated with Mr. Porges earlier in March of 2015 regarding Plaintiff's "desire to leave [Defendant] EQT and to determine [Mr. Porges'] willingness to consider offering something to [Plaintiff]." (Doc. No. 53 ¶ 49.) As to her communications with Mr. Porges regarding the end of Plaintiff's employment with Defendant EQT, Ms. Petrelli testified that Mr. Porges stated that while he did not want Plaintiff to leave Defendant EQT, he would

instruct Ms. Petrelli to "think about what might be reasonable to give [Plaintiff] as a gift, not because he is entitled to anything since he is resigning, but . . . to give to him to help him transition until he finds another job." (Doc. No. 44-3 at 5:5-12.) Ms. Petrelli considered the term "package out" as encompassing a payment made to an outgoing employee as a gratuity or gift, rather than any type of compensation through a severance agreement. (Doc. No. 44-3 at 13:8-18.)

According to Ms. Petrelli, in response to this directive from Mr. Porges, she consulted with Mr. Smith, "the head of compensation for the company." (Id. at 5:13-14.) Ms. Petrelli testified that while she did arrive at a recommendation as to the amount to give to Plaintiff, she could not recall the specific amount. (Id. at 8:1-3.) According to Ms. Petrelli, however, this information had been neither memorialized in writing nor communicated to Plaintiff because in the meantime, she had learned of Plaintiff's decision to leave his employment with EQT. (Id. at 9:5-11.) Ms. Petrelli testified that had she been aware that Plaintiff had already obtained employment following his departure from Defendant EQT, she would not have had a discussion with Mr. Porges about providing any type of payment to Plaintiff as a gift. (Id. at 20:16-24.)[6]

Following that email exchange with Ms. Petrelli, Plaintiff sent an email on March 30, 2015 to Mr. Porges in which he stated: "Dave – I wanted to thank you for all of the opportunities and mentoring you provided during my career at EQT. . . . If you are available for 5 minutes this afternoon or for a cup of coffee early tomorrow, I would love to thank you in person. Just let me

---

[6] In addition, Mr. Smith testified that after he spoke with Plaintiff regarding a severance package, he "calculated various scenarios" in which Plaintiff could be compensated, but noted that Plaintiff asked "to be packaged out," which "mean[t] nothing to [him]" because "that is something that [Ms. Petrelli] works on," commenting that "[b]enefits out of the severance plan" were within his purview, while "[b]eing packaged out because you're not happy in your current role would not go through [him]" but, rather, would be dealt with by Ms. Petrelli. (Doc. No. 50-4 at 7.)

know if something works." (Doc. No. 44-1 at 91.)  In response, Mr. Porges stated that he was

unavailable the prior afternoon or during the morning, but would be happy to meet with Plaintiff

in the future.  (Id.)  The next day, on March 31, 2015, Plaintiff forwarded this email exchange

with Mr. Porges to Ms. Petrelli, and in doing so, remarked as follows:

> Charlene – Given Dave's best wishes as expressed in our email exchange today, I
> recognize that my former position has been eliminated for all intent and purposes,
> but I would appreciate a clarification of my status so I know where I stand
> 'officially' with HR.  Thanks.

(Id.)  At this time, neither Mr. Porges nor Ms. Petrelli was aware of Plaintiff's offer regarding the

CFO position with Miller Energy or his acceptance of said offer.  (Doc. No. 53 ¶ 46.)

On April 2, 2015, Plaintiff sent Mr. Crawford an email – on which Plaintiff, Ms. Petrelli,

and Mr. Porges were copied – which reads as follows:

> Dear Randy – Please accept this written communication as notice of my intent to
> invoke "Good Reason" pursuant to revised section 3 of the Second Amendment to
> Confidentiality, Non-Solicitation and Non-Competition Agreement effective
> January l, 2015.  I believe that I have been demoted, reduced in stature, divested
> of responsibilities and staff, rendered redundant and left without an assignment or
> duties commensurate with my former position.  Although I have been informed
> that my position has been eliminated, my inquiries made to ascertain the
> organization's plans for me, and my day to day and long term status, have been
> effectively unanswered.  [For] all intents and purposes my employment has been
> terminated even though I have remained on the payroll.
>
> I will promptly execute any required release or other document required under the
> Agreement, and I ask that all such paperwork, and any other documents, be sent
> to me in hard copy for my execution.  If there is anything I must do in order to
> receive the stipulated payments, please advise me at once.
>
> Please be advised that I will commence employment with Miller Energy
> Resources with offices at 1001 Louisiana Avenue, Suite 3100, Houston, TX
> 77002 on April 6, 2015.  Miller Energy Resources is an Alaskan pure-play energy
> company.  Please accept this as notification per section 3, page 4, of the 2014
> employment agreement.
>
> Thank you for the opportunity to work with the EQT organization over the past 18
> plus years.

(Doc. No. 44-1 at 92.)  This communication from Plaintiff constituted the first notice to

Defendant EQT of Plaintiff's plans to begin employment elsewhere on April 6, 2015.  (Doc. No.

53 ¶ 57.)  Following Plaintiff's departure from Defendant EQT, Plaintiff's former job

responsibilities were not undertaken by a specific employee, but, rather, were divided among

multiple employees.  (Id. ¶ 65.)

Subsequent to leaving Defendant EQT, "Plaintiff had no communications with anyone in

leadership at EQT . . . between April 2 and April 11."  (Id. ¶ 60.)  Plaintiff did, however, receive

his salary (which amounted to $255,900 at the time of his departure from Defendant EQT), as

well as his benefits through April 2, and was compensated for his unused vacation time as of that

date.  (Id. ¶ 61.)  On April 11, 2015, Plaintiff contacted Mr. Crawford via email, stating, in

relevant part: "Randy – I was hoping to talk to you as I have [let] things sit with EQT for over a

week and there has been no communication from anyone. . . . Let's get this done without

additional complication."  (Doc. No. 44-1 at 93.)  The record does not indicate that Mr. Crawford

responded specifically to this message from Plaintiff.  (Id.)

Plaintiff made a formal request for benefits under the Plan – which is an ERISA-

governed plan, as explained supra – to Mr. Smith, who was acting as the Plan Administrator for

the Plan, on May 15, 2015.  (Doc. No. 53 ¶ 67.)  Mr. Smith then informed Plaintiff on July 21,

2015 that his claim for benefits was denied on the basis that "[n]o benefits shall be payable to a

Participant whose termination of employment is the result of voluntary resignation or retirement

by such Participant," and that Plaintiff "voluntarily resigned from employment with [Defendant]

EQT on April 2, 2015."  (Id. ¶ 71) (first alteration in original).  Plaintiff then appealed this

decision to the Plan Administrator on August 31, 2015.  (Id. ¶ 72.)  Mr. Smith acknowledged

receipt of the appeal on October 28, 2015, in addition to "respond[ing] to Plaintiff's request for

information [] and confirm[ing] the deadline for the [A]ppeals [C]ommittee to respond to Plaintiff's appeal." (Id. ¶ 73.) In connection with Plaintiff's claim for benefits, the Appeals Committee consisted of Mr. Smith, Ms. Petrelli, and Mr. Crawford, and Ms. Petrelli designated Mr. Crawford to serve on the Appeals Committee in light of his status as a senior leader of EQT Midstream. (Id. ¶ 74.) The Appeals Committee then convened for an in-person meeting, during which "they discussed Plaintiff's appeal, considered the documents that had been collected and produced to Plaintiff in connection with the appeal, and reached a[] unanimous decision denying the appeal." (Id. ¶ 75.) On December 10, 2015, the Appeals Committee notified Plaintiff of its decision to deny his appeal. (Id. ¶ 76.)

### B. Procedural Background

Plaintiff initiated the above-captioned action by filing a complaint in this Court against Defendants on February 8, 2016. (Doc. No. 1.) After filing an amended complaint on February 12, 2016 (Doc. No. 4), Plaintiff ultimately filed a second amended complaint on September 12, 2016 (Doc. No. 19), which Defendants answered on October 11, 2016 (Doc. No. 20). In the second amended complaint, Plaintiff asserts the following five counts: a claim against Defendant Pay Plan alleging a violation of the Employee Retirement Income Security Act ("ERISA"), codified at 29 U.S.C. § 1132(a)(1)(B) (Count I); a claim against Defendant Pay Plan alleging a violation of ERISA under 29 U.S.C. § 1132(a)(3)(b) (Count II); a claim for breach of contact against Defendant EQT (Count III); a claim alleging a violation of Pennsylvania's Wage Payment and Collection Law against Defendant EQT (Count IV), and a claim alleging detrimental reliance against Defendant EQT (Count V). (Doc. No. 19.) On October 19, 2018, Defendants filed the instant motion for summary judgment (Doc. No. 41), and in so doing, have

moved for summary judgment as to each of the counts described above. Having been fully briefed (Doc. Nos. 42, 48, 54), Defendants' motion is ripe for disposition.

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 governs the grant of summary judgment. Parties may move for summary judgment on particular claims or defenses, or on a part of each claim or defense. See Fed. R. Civ. P. 56(a). "The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" Pearson v. Prison Health Serv., 850 F.3d 526, 534 (3d Cir. 2017) (internal quotation marks omitted) (quoting Lamont, 637 F.3d at 181 (3d Cir. 2011)).

In pertinent part, parties moving for, or opposing, summary judgment must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials." See Fed. R. Civ. P. 56(c)(1)(A). "The non-moving party cannot rest on mere pleadings or allegations," El v. Se. Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007), but "must set forth specific facts showing that there is a genuine issue for trial," Saldana v. Kmart Corp., 260 F.3d 228, 231-32 (3d Cir. 2001). The Court "must view all evidence and draw all inferences in the light most favorable to the non-moving party" and will grant the motion only "if no reasonable juror could find for the non-movant." See Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008).

## III. DISCUSSION

Through the instant motion for summary judgment (Doc. No. 41), Defendant Pay Plan moves for summary judgment as to Plaintiff's claims alleging ERISA violations (Counts I and II), while Defendant EQT moves for summary judgment on Plaintiff's breach of contact claim, Plaintiff's claim alleging a violation of Pennsylvania's Wage Payment and Collection Law, and Plaintiff's claim alleging detrimental reliance (Counts III, IV, and V, respectively). The Court addresses whether summary judgment is warranted by examining each of Plaintiff's claims in turn.

### A. Plaintiff's Claim Against Defendant Pay Plan Alleging a Violation of Section 502(a)(1)(B) of ERISA (Count I)

In Count I of his second amended complaint, Plaintiff alleges that the actions of Defendants constituted a violation of Section 502(a)(1)(B) of ERISA because he "was and is entitled to severance pursuant to the terms of [the Plan]." (Doc. No. 19 at 7.) Accordingly, the Court examines whether Defendant Pay Plan is entitled to summary judgment as to Count I.

#### 1. Applicable Legal Standard

"Section 502(a)(1)(B) of ERISA allows a participant to bring a claim to recover benefits due to him under the terms of the plan." Miller v. Am. Airlines, Inc., 632 F. 3d 837, 845 (3d Cir. 2011) (citing 29 U.S.C. § 1132(a)(1)(B)).[7] "Where an ERISA plan grants the plan administrator discretionary authority to determine eligibility for benefits," a court shall "uphold the administrator's decision unless it is arbitrary and capricious." See Becknell v. Severance Pay Plan of Johnson & Johnson & U.S. Affiliated Cos., 644 F. App'x 205, 209 (3d Cir. 2016) (citing Fleisher v. Standard Ins. Co., 679 F. 3d 116, 120-21 (3d Cir. 2012)). As it pertains to a claim for

---

[7] 29 U.S.C. § 1132 is referred to as Section 502 of ERISA. See, e.g., Miller, 632 F.3d at 845 (referring to 29 U.S.C. § 1132(a)(1)(B) as "Section 502(a)(1)(B)").

benefits under Section 502(a)(1)(B), "[t]he arbitrary and capricious standard of review is essentially the same as the abuse of discretion standard." See Davies v. First Reliance Standard Life Ins. Co., No. 1:15-cv-2348, 2017 WL 930604, at *4 (M.D. Pa. Mar. 9, 2017) (citing Rizzo v. Paul Revere Ins. Grp., 925 F. Supp. 302, 310 (D.N.J. 1996)). "An administrator's decision is arbitrary and capricious 'if it is without reason, unsupported by substantial evidence[,] or erroneous as a matter of law.'" Miller, 632 F. 3d at 845 (quoting Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993)). "An interpretation that is 'reasonably consistent with unambiguous plan language' is not arbitrary." Becknell, 644 F. App'x at 210 (quoting Fleisher, 679 F.3d at 121). "The scope of review under the arbitrary and capricious standard is 'narrow, and the [C]ourt is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits.'" Id. (citing Doroshow v. Hartford Life & Accident Ins. Co., 574 F.3d 230, 233-34 (3d Cir. 2009)). "This approach, often referred to as Firestone deference, provides that 'a deferential standard of review [is] appropriate when a trustee exercises discretionary powers.'" Addington v. Senior Vice President-Human Res., Consol Energy, Inc., No. 17-cv-444, 2019 WL 3416098, at *6 (W.D. Pa. Mar. 15, 2019) (alteration in original) (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111 (1989)).

In applying this deferential standard of review to a claim asserted under Section 502(a)(1)(B), courts "should apply a deferential abuse of discretion standard across the board and consider any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its discretion." See Estate of Schwing v. The Lilly Health Plan, 562 F.3d 522, 525 (3d Cir. 2009) (citing Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 115 (2008)). "[C]ourts review 'various procedural factors underlying the administrator's decision-making process, as well as structural concerns regarding how the particular ERISA plan was

funded.'" Schweikert v. Baxter Healthcare Corp., No. 12-cv-5876, 2015 WL 4578443, at *17 (D.N.J. July 29, 2015) (quoting Miller, 632 F.3d at 845). Courts may also consider the presence of a conflict, which in the context of denial of benefits in an ERISA case, arises "[w]here the plan administrator 'both determines whether an employee is eligible for benefits and pays benefits out of its own pocket.'" See Green v. Equifax Information, LLC, No. 10-cv-244, 2011 WL 4594226, at *7 (D.N.J. Sept. 30, 2011) (quoting Glenn, 554 U.S. at 108). "[A] reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits." (Id.) (quoting Glenn, 554 U.S. at 108). A court's analysis of a plan administrator's decision-making process is a case-specific inquiry. See, e.g., Miller, 632 F.3d at 845 ("Ultimately, we 'determine lawfulness by taking account of several different, often case-specific factors, reaching a result by weighing all together.'" (quoting Glenn, 554 U.S. at 117)).

## 2.    Arguments of the Parties

Defendants argue that summary judgment is warranted as to Count I because the provisions of the Plan are clear and unambiguous, and while benefits under the Plan "are payable as a result of '[p]osition elimination due to reorganization or lack of work,' the Plan makes clear that '[n]o benefits shall be payable to a Participant . . . [w]hose termination of employment is the result of . . . [a] voluntary resignation or retirement by such Participant.'" (Doc. No. 42 at 8) (alterations in original). Further, Defendants cite the express terms of the Plan, which they state "grant complete discretionary authority to the Plan Administrator and to the Appeals Committee to, among other things, determine eligibility for benefits in accordance with the provisions of the Plan and to construe the terms of the Plan[,]" thus demonstrating that the decision to deny Plaintiff severance benefits is supported by the Plan's terms and, consequently, neither arbitrary nor capricious. (Id.) In a similar vein, Defendants state that the record is devoid of any evidence

suggesting that Plaintiff's position was eliminated, stating that Plaintiff resigned and noting primarily that Plaintiff has admitted the following: "that he was never terminated by anyone at EQT"; "that he began looking for new employment in February, without informing EQT"; "that he accepted employment with Miller Energy . . . on March 25 [of 2015]"; "that he was aware that no separation package was authorized on or before March 25"; "and that he ultimately resigned from EQT . . . on April 2, without ever being offered a separation package from EQT." (Id. at 9.) According to Defendants, therefore, "[b]ased on the strict terms of the Plan, Plaintiff was not eligible for benefits based on this voluntary resignation." (Id.) Further, Defendants maintain that to the extent Plaintiff argues that he was constructively discharged from his employment with Defendant EQT, he is nonetheless not entitled to the benefits he requests because the Plan "does not provide benefits for constructive discharge." (Id.) Defendants posit that in light of the evidence of record and undisputed facts, Plaintiff cannot establish that the denial of severance was arbitrary and capricious and, consequently, Defendant EQT is entitled to summary judgment on Count I of the second amended complaint. (Id. at 9-10.)

In opposition, Plaintiff argues that the undisputed facts do not suggest that he resigned but, rather, show that the issue of whether Plaintiff resigned or his position was eliminated "is the core disputed factual determination" presently before the Court. (Doc. No. 48 at 8.) According to Plaintiff, it bears noting that Defendants admit Plaintiff's position was not filled in the wake of his exit from employment with Defendant EQT, and the relevant evidence of record also "permit[s] a finding that [Plaintiff's] position was actually eliminated while he was still in it." (Id.) According to Plaintiff, a factfinder could conclude "that the removal of [Plaintiff's] responsibilities, employees, and access to information does, coupled with the undisputed fact that his position was 'split' among existing employees after his exit, establish that [Plaintiff's]

position was, in fact, eliminated." (Id.)  Further, Plaintiff notes that in evaluating whether the

denial of benefits under the Plan was arbitrary and capricious, "[t]he arbitrary and capricious

standard under ERISA has been 'softened' in cases where fiduciaries and administrators had

some bias or adverse interest." (Id. at 8-9.)[8]  Plaintiff states that this principle is applicable to the

instant case, where there are "self-evident" conflicts in connection with the denial of benefits to

Plaintiff that warrant a less stringent standard of review.  (Id. at 9.)[9]  In support of this point,

Plaintiff points to the membership of the Appeals Committee – which consisted of Mr. Smith,

Ms. Petrelli, and Mr. Crawford – and states that each member "was a participant in the creation

of a separation package for [him]" given that Mr. Crawford "removed [Plaintiff's] job

responsibilities and employees and ultimately eliminated [Plaintiff's] position" and Mr. Smith

reported to Ms. Petrelli, who ultimately decided that Plaintiff was not entitled to a separation

package.  (Id.)  Plaintiff maintains that these facts indicate an "extremely high" level of conflict,

especially when considered in light of the timing of the relevant events and Ms. Petrelli's

testimony that she intentionally delayed acting on Plaintiff's request for benefits "based on her

'belief' that [Plaintiff] was better off continuing to draw a paycheck."  (Id.)  According to

Plaintiff, based on the foregoing, "[t]he arbitrary and capricious standard is a sliding scale when

these types of conflicts are present" and in this case, the Court should apply such a standard

[8] In reply, Defendants comment that despite Plaintiff's argument in favor of a "sliding-scale"
approach, "[t]he Third Circuit has overruled the sliding-scale approach, finding that it is no
longer valid in light of the Supreme Court's holding in" Metropolitan Life Insurance Company v.
Glenn, 554 U.S. 105 (2008).  (Doc. No. 54 at 2) (citing Estate of Schwing, 562 F.3d at 525).

[9] As to this point, Defendants state that despite Plaintiff's characterization of this alleged conflict
as "self evident," Plaintiff has not pointed to any evidence of record suggesting "that the
composition of the Appeals Committee influenced the decision to deny [Plaintiff] benefits under
the Plan."  (Id. at 3-4.)

when evaluating the self-evident conflicts surrounding the denial of benefits to Plaintiff, which warrants the denial of summary judgment as to Count I of the second amended complaint. (Id.)

### 3. Whether Defendant Pay Plan is Entitled to Summary Judgment as to Count I of the Second Amended Complaint

Upon review of the relevant evidence of record, the parties' arguments, and the applicable law, the Court finds that the disposition of Defendants' motion as to Count I is improper at this juncture and, accordingly, will summarily deny Defendants' motion as to Count I. As a threshold matter, the Court observes that for purposes of assessing Plaintiff's claim asserted at Count I, the evidence that the Court may consider is generally limited to that contained in the administrative record. See Heimeshoff v. Hartford Life & Accident Ins. Co., 51 U.S. 99, 111 (2013) (acknowledging that "[t]he Courts of Appeals have generally limited the record for judicial review to the administrative record compiled during internal review") (citing Foster v. PPG Indus., Inc., 693 F.3d 1226, 1231 (10th Cir. 2012); Fleisher v. Standard Ins. Co., 679 F.3d 116, 121 (3d Cir. 2012); McCartha v. Nat'l City Corp., 419 F.3d 437, 441 (6th Cir. 2005)). In the case at bar, however, Defendants neither state which specific evidentiary items constitute part of the administrative record nor provide a comprehensive filing containing the entire administrative record, in contrast to submissions from parties in certain other cases. See, e.g., Green, 2011 WL 4594226, at *1 (stating that the parties discussed with the court "the contents of the administrative record to be considered in the [c]ourt's review of [the] case" and that "[t]he [c]ourt accepts the administrative record filed by [the] [d]efendant for purposes of deciding the current motion"). Given that the Court lacks a proper foundation for adjudicating this claim at the summary judgment stage, the Court will summarily deny Defendants' motion as to Count I.

### B. Plaintiff's Claim Against Defendant Pay Plan Alleging a Violation of Section 502(a)(3)(b) of ERISA (Count II)

In Count II of his second amended complaint, Plaintiff asserts a claim for equitable relief against Defendant Pay Plan pursuant to Section 502(a)(3)(B) of ERISA (Doc. No. 19 at 9), which provides that in bringing a civil action under this section of ERISA, one may seek "other appropriate equitable relief."  See 29 U.S.C. § 1132(a)(3)(B).  In support of this count, Plaintiff incorporates his allegations pertaining to Count I and demands a jury trial as to this claim.  (Doc. No. 19 at 9.)

### 1.    Applicable Legal Standard

In asserting an ERISA claim pursuant to 502(a)(3)(B), "a participant, beneficiary, or fiduciary [may] . . . obtain other appropriate equitable relief" to redress the given ERISA violations or "to enforce any provisions of this subchapter."  See 29 U.S.C. § 1132(a)(3)(B).  Section 502(a)(3) "is a 'catchall' provision that offers 'appropriate equitable relief for injuries caused by violations that § 1132 does not elsewhere adequately remedy.'"  See Boyles v. Am. Heritage Life Ins. Co., No. 3:15-cv-274, 2016 WL 4031295, at *8 (W.D. Pa. July 26, 2016) (citing Varity Corp. v. Howe, 516 U.S. 489, 508-09, 512 (1996)).  As explained by the United States Supreme Court in Varity Corporation v. Howe, this statutory section "authorizes 'appropriate' equitable relief[,]" which dictates "that courts, in fashioning 'appropriate' relief, will keep in mind 'the special nature and purpose of employee benefit plans,' and will respect the 'policy choices reflected in the inclusion of certain remedies and the exclusion of others.'"  See Varity, 516 U.S. at 515 (quoting Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 54 (1987)).  "Since the Supreme Court issued its ruling in Varity, 'Courts of Appeals have reached differing conclusions as to whether and under what circumstances Varity precludes plaintiffs from simultaneously seeking relief under § 1132(a)(3) and § 1132(a)(1)(B).'"  Boyles, 2016 WL 4031295, at *9 (quoting Greene v. Hartford Life & Accident Ins. Co., No. 13-cv-6033, 2014 WL

4473725, at *3 (E.D. Pa. Sept. 10, 2014)). Notably, "the Third Circuit has not addressed the question directly, and district courts within this Circuit have reached difficult results on the issue." See id. Because the relief authorized by Section 1132(a)(3) is equitable in nature, a plaintiff is not entitled to a jury trial on such a claim. See, e.g., Borger v. Highmark Blue Shield, No. 3:07-cv-2210, 2008 WL 11494797, at *9 (citing Sheet Metal Works Local 19 v. Keystone Heating & Air Conditioning, 934 F.2d 35, 39-40 (3d Cir. 1991)).

### 2. Arguments of the Parties

Defendants assert that Count II of the second amended complaint "is an improper attempt to reframe a claim for benefits under § 502(a)(3)" because Section 502(a)(3) permits only "claims pertaining to fiduciary obligations related to the Plan's financial integrity – not claims regarding denial of benefits" under Varity. (Doc. No. 42 at 10.) According to Defendants, the instant case involves "no claims regarding fiduciary obligations related to the Plan's financial integrity." (Id.) Further, Defendants state that because Plaintiff Section 502(a)(1)(B) provides Plaintiff with an adequate remedy in connection with his claim for benefits, even though Defendants maintain he is not entitled to relief as to Count I, "there is no legal basis for relief under Section 502(a)(3)." (Id.) Defendants also maintain that, even assuming Plaintiff is permitted to assert a separate claim for relief under Section 502(a)(3), his claim asserted at Count II is meritless because "Plaintiff admits that his position was not eliminated and that he could have remained employed by EQT in the same position if he had not resigned and taken a new job elsewhere." (Id. at 10-11.) In support of this point, Defendants refer to the language included in the second amended complaint, noting that Plaintiff alleges the following: "that his position with EQT was eliminated"; "that he had all responsibilities removed by EQT [and] was informed by his direct supervisor . . . that his position was eliminated and that he would receive a severance package"; that after being advised to that effect, he "began searching for and accepted

employment elsewhere and resigned his employment with EQT"; and that Defendant Pay Plan "then used [his] resignation as justification for failing to provide him with severance benefits." (Id.)  In sum, Defendants posit that "Plaintiff does not have the proper legal foundation for a claim under [Section] 502(a)(3)(B)" and "Plaintiff's own admissions demonstrate that Plaintiff's position was not eliminated."  (Id. at 11.)

In opposition, Plaintiff states that, contrary to Defendants' arguments as to Varity described above, Varity supports the proposition that "Section 502(a)(3) claims for equitable relief are properly raised as alternative or secondary claims because the statute permits 'appropriate equitable relief.'"  (Doc. No. 48 at 10.)  According to Plaintiff, ergo, Varity does not prohibit him from asserting the claim under Section 502(a)(3) at Count II but, rather, "speaks to the relief potentially available under such a claim."  (Id. at 10-11.)  Plaintiff adds that in light of the facts of the instant case, where the employees who "misled [him] with respect to the package that he would receive . . . were the same employees who then acted as 'fiduciaries' and denied his claim for severance under the Plan[,] [t]his is precisely the type of situation where equitable relief may be available under Varity."  (Id. at 11.)  Finally, Plaintiff asserts that because there are key facts in dispute regarding removal of his work responsibilities prior to the end of his employment with Defendant, as well as whether his position was eliminated, the existence of these disputes compels denial of Defendants' motion as to Count II.  (Id.)

### 3.      Whether Defendant Pay Plan is Entitled to Summary Judgment as to Count II of the Second Amended Complaint

The Court concludes that summary judgment in favor of Defendant Pay Plan is proper as to Count II of the second amended complaint and, accordingly, will grant Defendants' motion as it pertains to Count II.  As explained supra, the Court will deny Defendants' motion as to Count I, through which Plaintiff asserts his claim for benefits under Section 502(a)(1)(B).  Despite

Plaintiff's references to the "catch-call" language in Section 502(a)(3)(B) in the second amended complaint, it is clear that for purposes of potential recovery under ERISA, Plaintiff is seeking payment of the severance benefits he was denied.  Consequently, Plaintiff already has an adequate remedy in Section 502(a)(1)(B), which negates the need to pursue relief through Section 502(a)(3)(B).  See, e.g., Miller v. Mellon Long Term Disability Plan, 721 F. Supp. 2d 415, 423-24 (W.D. Pa. 2010) (finding that the plaintiff's claim for relief under Section 502(a)(3) lacked merit in light of the plaintiff having asserted a claim for recovery of benefits under Section 502(a)(1)(B) and noting Supreme Court precedent stating that "where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate'" (quoting Varity, 516 U.S. at 515)).  Accordingly, the Court will grant Defendants' motion for summary judgment as to Count II of the second amended complaint.

### C.  Plaintiff's Claim Against Defendant EQT Alleging Breach of Contract (Count III)

In Count III of the second amended complaint, Plaintiff asserts a claim for breach of contract against Defendant EQT on the basis that the Non-Compete Agreement "required severance payments to be made to [] Plaintiff if his employment was terminated without 'Cause.'"  (Doc. No. 19 at 9.)  Plaintiff alleges that because he was constructively discharged, his discharge was without "Cause" for purposes of the Non-Compete Agreement, thus entitling him to severance benefits.  (Id. at 9-10.)  According to Plaintiff, therefore, by not providing severance benefits to him, Defendant EQT breached its contractual obligation to Plaintiff under the Non-Compete Agreement.  (Id. at 10.)

### 1.    Applicable Legal Standard[10]

In Pennsylvania, a claim alleging breach of contract consists of the following elements: (1) "the existence of a contract"; (2) "a breach of a duty imposed by the contract"; and (3) "damages caused by the breach." See Ins. Co. of Greater N.Y. v. Fire Fighter Sales & Serv. Co., 120 F. Supp. 3d 449, 456 (citing Haywood v. Univ. of Pittsburgh, 976 F. Supp. 2d 606, 625 (W.D. Pa. 2013)). The plaintiff bears the burden of establishing that each of the aforementioned elements has been satisfied. See Williams Pontiac Co. v. Patriot Buick Pontiac GMC, Inc., Nos. 15-1459, 17-1964, 2018 WL 3234214, at *4 (Pa. Super. Ct. July 3, 2018) (citing McShea v. City of Phila., 995 A.2d 334, 340 (Pa. 2010)). "[I]t is a well-established principle of contract law that, where the language of a contract is clear and unambiguous, a trial court is required to give effect to that language." TruServ Corp. v. Morgan's Tool & Supply Co., Inc., 39 A.3d 253, 261 (Pa. 2012) (citing Madison Constr. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999)).

### 2.    Arguments of the Parties

Defendants maintain that summary judgment as to this count is proper because Plaintiff was not eligible for severance benefits under the Non-Compete Agreement on the grounds that he "was neither terminated by [Defendant] EQT nor did he resign for 'Good Reason.'" (Doc. No. 42 at 11.) To that end, Defendants reiterate points previously raised in support of their motion as to Counts I and II by asserting that Plaintiff voluntarily resigned from his employment and that "the undisputed facts show that Plaintiff did not resign for 'Good Reason[,]'" where he was never demoted and never experienced a reduction in pay by Defendant EQT "at any time

---

[10] The Court analyzes Plaintiff's state law claims in accordance with Pennsylvania law. See Romero v. Allstate Ins. Co., No. 01-cv-3894, 2018 WL 2325405, at *5 (E.D. Pa. May 22, 2018) ("Where a district court exercises diversity or supplemental jurisdiction, the Erie doctrine requires us to apply the forum state's substantive law for the state law claims . . . ." (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938))).

during 2013, 2014, or 2015." (<u>Id.</u> at 11-12.) According to Defendants, consequently, Plaintiff

lacked "Good Reason" to invoke the Non-Compete Agreement for purposes of severance

benefits. (<u>Id.</u> at 12.) In opposition, Plaintiff states that, as to the facts at issue regarding the

interpretation of "Good Reason," while it is true that his salary was not decreased, "the record

establishes that a genuine issue of material fact exists with respect to whether [he] was

demoted[,]" because "a factfinder can reasonably conclude that the removal of all of [Plaintiff's]

responsibilities, his employees, and his access to meetings[] substantiates a factual finding that

[Plaintiff] was, sometime in the beginning of 2015, demoted from his position." (Doc. No. 48 at

12.) Plaintiff rebuffs Defendants' argument that he was never demoted by stating that, at bottom,

this argument "rests solely on a claim that [Plaintiff] was never formally demoted[,]" while "the

record is replete with factual disputes over whether [Plaintiff's] position was eliminated even

while he still held it." (<u>Id.</u>) Plaintiff additionally states that, even if he were not demoted, a

factfinder could reasonably conclude that he was constructively discharged, as demonstrated

from the evidence of record suggesting that his employment responsibilities were removed and

his position was effectively eliminated. (<u>Id.</u> at 13.) According to Plaintiff, therefore, because

there are key factual disputes for purposes of Count III, summary judgment is improper and

Defendants' motion should be denied as to his breach of contract claim. (<u>Id.</u>)[11]

### 3. Whether Defendant EQT is Entitled to Summary Judgment as to Count III of the Second Amended Complaint

---

[11] In their reply brief, Defendants state that Plaintiff's contract claim "turns on the definition of the word 'demoted,' which [Plaintiff] asks the Court to interpret broadly enough to include 'position elimination' or 'constructive discharge[,]'" neither of which, Defendants assert, is "covered under the definition of 'Good Reason' set forth in the Non-Compete Agreement." (Doc. No. 54 at 7.) Defendants argue that these terms "have meanings that are separate and distinct from the word 'demote[,]'" which compels the conclusion that Plaintiff was not "demoted so as to trigger a legal requirement on [Defendant] EQT's part." (<u>Id.</u> at 8-9.)

Upon review of the record, and having considered the relevant authority, the Court finds that summary judgment in favor of Defendant EQT is improper as to Count III. The Court concludes that Plaintiff has proffered sufficient evidence to survive summary judgment because Plaintiff has pointed to evidence that supports the elements of a contract claim under Pennsylvania law: (1) the existence of a contract, as evidenced by the Non-Compete Agreement; (2) an alleged breach of the duty imposed by the contract, as demonstrated by the failure to pay Plaintiff severance benefits, which Plaintiff alleges Defendant EQT was contractually obligated to do; and (3) damages as a result of said alleged breach, in the form of Plaintiff not having received the requested severance payment. See Ins. Co. of Greater N.Y., 120 F. Supp. 3d at 456 (citing Haywood, 976 F. Supp. 2d at 625). Further, there are numerous factual disputes as to the circumstances surrounding the end of Plaintiff's employment with Defendant EQT. In the initial letter denying Plaintiff's claim, the Plan Administrator, Mr. Smith, states that Plaintiff was ineligible for benefits because he "voluntarily resigned from employment with EQT on April 2, 2015." (Doc. No. 44-1 at 95.) In the subsequent letter denying Plaintiff's appeal, Mr. Smith wrote, in pertinent part, that:

> In reaching this determination, we considered your claim under Plan Section II, Paragraph A(2). Contrary to your statements in support of your claim, your employment was not "terminated by the Company as a result of position elimination due to reorganization or lack of work" as contemplated under Section II, Paragraph A(2) of the Plan. Instead, after you received notice that you would not be promoted to the position of Chief Financial Officer for EQT Midstream Partners, rather than choosing to continue your employment with EQT and remain in your existing position, you informed the company that you would be leaving your employment. At that time, you made the request to be "packaged out." You also requested permission to exhaust your remaining vacation time, which ran for over three weeks, and you voluntarily chose to stop reporting to work. You further requested permission to transition your reports to other EQT managers. On April 2, 2015, you voluntarily submitted your resignation and announced that effective April 6, 2015, you would begin your new employment with Miller Energy Resources.

(Doc. No. 44-1 at 100.)  In addition, there is evidence of record suggesting that Plaintiff had previous discussions with Mr. Crawford, a member of the Appeals Committee, regarding his request for severance benefits, specifically as to Mr. Crawford's indication to Plaintiff that he would "package him out" in the event he left his employment with Defendant EQT.  (Doc. No. 53 ¶ 12.)  Moreover, the record suggests that Plaintiff's request to be "packaged out" was made earlier than the point in time referred to by Mr. Smith in the above letter, in light of Plaintiff's testimony as to these previous discussions with Mr. Crawford.  (Doc. No. 44-1 at 17:19-25.) Additionally, there were multiple email exchanges between Plaintiff and employees of Defendant EQT, including those on the Appeals Committee, as to Plaintiff's request for benefits, which occurred prior to April 2, 2015, the date on which Plaintiff sent the email Defendants argue constituted his resignation.

Further, the Court finds that Plaintiff has pointed to sufficient evidence that would permit a finding that his position with Defendant EQT was eliminated, as demonstrated by the email communications discussing Plaintiff's diminished work responsibilities, as well as the testimony to that effect.  Specifically, Plaintiff testified that after he finished preparing his 2015 business plan in December of 2014, Mr. Crawford had indicated to him that there was "no reason" for him to attend certain meetings at Defendant EQT and "agree[d] that there was no purpose for [Plaintiff] to be in those meetings any longer . . . [b]ecause [Mr. Crawford] was going to package [him] out."  (Doc. No. 44-1 at 57:24-25, 58:1-8.)  In a similar vein, Plaintiff testified that at a certain point, he "had zero responsibilities" in his employment as a result of Mr. Crawford's representations to him.  (Id. at 59:3-5.)  Further, in an email to Ms. Petrelli dated March 31, 2015, Plaintiff remarked as follows: "I recognize that my former position has been eliminated for all intents and purposes, but I would appreciate a clarification of my status so I know where I

stand 'officially' with HR." (Doc. No. 44-1 at 91.) Moreover, there is no indication that Plaintiff was replaced at Defendant EQT following his departure from the company. (Doc. No. 44-3 at 16:11-18.)[12]

It is clear from the record and undisputed facts that the parties debate the circumstances under which Plaintiff's employment ended, namely whether Plaintiff resigned or, rather, left his employment because his position was eliminated and/or he was constructively discharged. See Doc. No. 44-1 at 92, 94, 95, 96, 100; see also Doc. Nos. 44-1 at 91, 57:24-25, 58:1-8, 59:3-5, 44-3 at 16:11-18. Such a dispute is necessarily material because a finding that Plaintiff resigned dictates his eligibility for severance benefits under the Plan, which provides that a participant is ineligible for benefits under the Plan if, inter alia, the participant voluntarily resigns from his or her employment. (Doc. No. 44-5 at 7.) The Court also observes that there is conflicting testimony regarding how those at Defendant EQT contemplated Plaintiff's potential benefits, including disagreement as to the meaning of the term "package out" as well as whether a gratuity or gift payment would be made to Plaintiff. (Doc. Nos. 44-1 at 17:19-25, 44-3 at 13:8-18.) This disagreement is of significance because it involves testimony as to Ms. Petrelli's understanding of Plaintiff's benefits, for Ms. Petrelli was involved in the formulation of the Appeals Committee. (Doc. No. 44-3 at 11:11-18.) These key factual disputes – many of which necessarily require a credibility determination – render summary judgment improper. See, e.g., Simmons v. Simpson House, Inc., 259 F. Supp. 3d 200, 205 (E.D. Pa. Apr. 10, 2017) (stating

---

[12] Ms. Petrelli testified, though, that Plaintiff was not formally replaced because he "had a unique skill set" and his position with Defendant EQT had been "created just for him[,]" which led to other employees absorbing various responsibilities formerly held by Plaintiff following his departure from Defendant EQT. (Doc. No. 44-1 at 16:11-18.) In light of the Court's analysis regarding the propriety of summary judgment as to Count I, however, the Court finds this testimony to be further evidence of the fundamental dispute as to whether Plaintiff's employment was eliminated for purposes of the instant claim.

that a court is prohibited from making "credibility determinations or weigh[ing] the evidence in considering motions for summary judgment" (citing <u>Reeves v. Sanderson Plumbing Prods.</u>, 530 U.S. 133, 150 (2000); <u>Goodman v. Pa. Tpk. Comm'n</u>, 293 F.3d 655, 665 (3d Cir. 2002))).

Accordingly, the Court cannot determine based on the record presently before it whether, as a matter of law, Plaintiff can invoke "Good Reason" for purposes of the Non-Compete Agreement. <u>See, e.g.</u>, <u>Covanta Energy Grp., Inc. v. Sarkar</u>, 80 F. App'x 221, 222-23 (3d Cir. 2003) (affirming the lower court's finding following a bench trial that the former employee could cite "good reason" for resigning under his employment agreement "because it was reasonable [for the employee] to conclude that there was a significant diminution in his responsibilities"); <u>Wieczorek v. Dempsey Partners, LLC</u>, No. 12-cv-4170, 2013 WL 6578788, at *6 (E.D. Pa. Dec. 16, 2013) (denying the defendants' motion for summary judgment on a breach of contract claim and noting, <u>inter alia</u>, that "[t]here is a genuine issue of material fact concerning whether [the] plaintiff's termination for cause was without basis" for purposes of the plaintiff's potential entitlement to severance benefits under the parties' agreement).[13]  The Court, therefore, will deny Defendants' motion as to Count III of the second amended complaint.

---

[13] Notably, in denying summary judgment as to the plaintiff's contract claim, the district court in <u>Wieczorek</u> reiterated the general principle that "where an agreement involves clear and ambiguous terms, the plain meaning of the terms will be enforced." <u>See</u> <u>Wieczorek</u>, 2013 WL 6578788, at *6 (citing <u>TruServ Corp.</u>, 39 A.3d at 261).  The court reasoned that in accordance with this established principle, summary judgment was improper because "[t]he parties' agreement clearly and unambiguously indicates that [the] plaintiff is entitled to severance payments if he is separated without cause." <u>See</u> <u>id.</u>  This Court finds such reasoning applicable to the case at bar and, therefore, will deny Defendants' motion as to Count III of the second amended complaint.

The Court also observes that, for purposes of this aspect of Plaintiff's contract claim, Defendants' briefing is conclusory in that Defendants essentially reiterate their assertion that Plaintiff is incapable of showing that he resigned for "Good Reason" or that he was terminated by Defendant EQT based on their claim that he "voluntarily resigned" via email on April 2, 2015 and was "never demoted." (Doc. Nos. 42 at 12, 54 at 8-9.)  Such arguments oversimplify the

### D. Plaintiff's Claim Against Defendant EQT Alleging a Violation of Pennsylvania's Wage Payment and Collection Law (Count IV)

Through Count IV of the second amended complaint, Plaintiff sets forth a claim for a violation of Pennsylvania's Wage Payment and Collection Law (the "WPCL"), PA. CONS. STAT. § 260.1, et seq., on the ground that he was "contractually entitled to severance" under the Non-Compete Agreement, and the severance payments are "earnings" for purposes of the statute. (Doc. No. 19 at 11.) Plaintiff further alleges that by failing to pay him the requested severance benefits, Defendant EQT has violated this statute. (Id.)

#### 1. Applicable Legal Standard

"The WPCL provides a civil remedy for employees to 'recover unpaid wages' from their employers." Screen Actors Guild-Am. Fed. of Television & Radio Artists, AFL-CIO v. Sheridan Broadcasting Networks, No. 18-cv-455, 2019 WL 1505866, at *5 (W.D. Pa. Apr. 5, 2019) (citing 43 PA. CONS. STAT. § 260.9a(b)). The statute "includes within the definition of wages 'all earnings of an employe,' as well as 'fringe benefits.'" See id. (citing 43 PA. CONS. STAT. § 260.2a). "Severance pay obligations in an employment contract fall under the WPCL's definition of 'wages.'" Qazizadeh v. Pinnacle Health Sys., 214 F. Supp. 3d 292, 303 (M.D. Pa. 2016) (citing 43 PA. CONS. STAT. § 260.2a); see also Harris v. Vitran Express, Inc., No. 2:14-cv-00704, 2016 WL 6495995, at *3 (W.D. Pa. Nov. 2, 2016) (describing a claim for recovery of "severance and retention benefits under the [employment] agreements" under the WPCL).

#### 2. Arguments of the Parties

Defendants assert that summary judgment is warranted as to Count IV of the second amended complaint primarily because the WPCL "does not create a statutory right to wages[,]"

---

record in this case, which calls into question the manner in which Plaintiff left his employment with Defendant EQT and renders summary judgment improper.

but, rather, provides a statutory remedy in instances where an employer has breached a contractual obligation to pay wages. (Doc. No. 42 at 12.) Defendants state that, in this case, the parties' employment agreement determines whether wages are owed to Plaintiff and, because Plaintiff resigned, Plaintiff's employment was not terminated and he cannot invoke the "Good Reason" provision in the Non-Competition Agreement. (Id.) According to Defendants, therefore, "benefits under the Non-Compete Agreement were not earned wages," thus rendering Plaintiff's WPCL claim devoid of merit. (Id.) In opposing Defendants' motion as to this count, Plaintiff reiterates his arguments advanced in opposition to Defendants' motion with respect to his breach of contract claim and states that Count IV "must similarly survive summary judgment because of the genuine issues of material facts present in the record." (Doc. No. 48 at 13.)

### 3. Whether Defendant EQT is Entitled to Summary Judgment as to Count IV of the Second Amended Complaint

The Court finds that summary judgment is improper as to Plaintiff's WPCL claim and, therefore, will deny Defendants' motion for summary judgment as to Count IV of the second amended complaint. First, the Court concludes that the WPCL is applicable to Plaintiff's claim for severance benefits under the Non-Compete Agreement in light of the authority dictating that severance payments are considered "wages" for purposes of the WPCL. See 43 PA. CONS. STAT. § 260.2a (stating that the Act applies to "wages," which includes "fringe benefits or wage supplements" and also stating that "fringe benefits or wage supplements" include, inter alia, "separation" pay); see also Qazizadeh, 214 F. Supp. 3d at 303 (finding that the WPCL applied to a claim concerning non-payment of severance benefits). Second, as explained supra, there are numerous factual disputes in this case that necessarily preclude summary judgment regarding Defendant EQT's potential statutory obligation to remit such payments under the WPCL. Accordingly, at this juncture, the Court cannot determine that Defendant EQT is entitled to

judgment as a matter of law on this claim and, therefore, will deny Defendants' motion as to Count IV.[14]

E.    **Plaintiff's Claim Against Defendant EQT Alleging Detrimental Reliance (Count V)**

Plaintiff's fifth and final claim alleges detrimental reliance against Defendant EQT on the basis that: during his employment with Defendant EQT, various EQT officers made representations to him that he would receive severance benefits; he reasonably relied on those representations to his detriment in requesting severance payments from Defendant EQT; and he sought employment outside of Defendant EQT on the belief that he would be provided with a severance package.  (Doc. No. 19.)

1.    **Applicable Legal Standard**

Under Pennsylvania law, a claim for detrimental reliance, or promissory estoppel,[15] consists of the following elements: "(1) a promise to a promisee, (2) which the promisor should reasonably expect will induce action by the promisee, (3) which does induce action, and (4) which should be enforced to prevent injustice to the promisee."  See Burton Imaging Grp. v. Toys "R" Us, Inc., 502 F. Supp. 2d 434, 438-39 (E.D. Pa. 2008) (quoting C&K Petroleum Prods., Inc. v. Equibank, 839 F. 2d 188, 192 (3d Cir. 1988)).  "The first essential element . . . requires an express promise between the promisor and promise[,]" and, accordingly, "a 'broad or vague implied promise' will not suffice."  See id. at 439 (quoting C&K Petroleum

---

[14] The Court notes that Plaintiff may proceed with both a contract claim and WPCL claim simultaneously.  See McGoldrick v. TruePosition, Inc., 623 F. Supp. 2d 619, 628 (E.D. Pa. 2009) (denying summary judgment as to both the plaintiff's breach of contract claim and WPCL claim).

[15] See Matarazzo v. Millers Mut. Grp., Inc., 927 A.2d 689, 692 (Pa. Commw. Ct. 2007) ("Detrimental reliance is another name for promissory estoppel." (citing Travers v. Cameron Cty. Sch. Dist., 544 A.2d 547 (1988))).

Prods., Inc., 839 F.2d at 192). Moreover, "[e]ven an express promise must indicate with 'reasonable certainty' the intent of the parties." See id. (citing Ankerstjerne v. Schlumberger Ltd., No. 03-cv-2607, 2004 WL 1068806, at *5 (E.D. Pa. May 12, 2004)). One may assert a claim for detrimental reliance as an alternative theory of recovery while also asserting a claim for breach of contract. See, e.g., ITP, Inc. v. OCI Co., Ltd., 865 F. Supp. 2d 672, 680 (E.D. Pa. Mar. 26, 2012) (recognizing the permissibility of asserting a promissory estoppel claim and breach of contract claim simultaneously).

### 2. Arguments of the Parties

Defendants assert that summary judgment is warranted as to Plaintiff's detrimental reliance claim because while they did not represent to Plaintiff that he would receive any type of severance package, even if such a representation had been made, Plaintiff is unable to make a sufficient evidentiary showing to support a detrimental reliance claim. Defendants argue primarily that the undisputed facts demonstrate that at the time Plaintiff accepted employment with Miller Energy, he "knew on March 25 – the date he signed his employment with Miller Energy – that no separation package had been authorized for him by [Defendant] EQT[,]" as demonstrated by Plaintiff's acceptance of an offer from Miller Energy while being informed by Ms. Petrelli on the same date "that she had no authority to offer him a separation package" absent the approval of Mr. Porges to do so. (Doc. No. 42 at 13.) According to Defendants, because Plaintiff's arguments as to reliance are "flatly contrary to [the] undisputed facts" surrounding the end of his employment with Defendant EQT, the Court should grant the motion as to Plaintiff's detrimental reliance claim. (Id. at 14.)

In opposition, Plaintiff states that Defendants ignore key factual disputes, which the Court is required to construe in his favor at this juncture in light of his status as the non-moving party. (Doc. No. 48 at 14.) Further, Plaintiff states that the relevant evidence of record permits

him to satisfy the elements of detrimental reliance because: Mr. Crawford indicated to him that he would receive a severance package; he subsequently "undertook a job search based on the understanding that his employment was ending"; he accepted the offer of employment with Miller Energy based on the understanding that his severance package was generally approved by the CEO of Defendant EQT, but that only minor details as to the severance package remained unresolved; his reliance on the representations was reasonable because no one informed him that payment of severance benefits "was contingent upon him being unemployed"; Defendant EQT "actually approved a severance/separation package for [Plaintiff] before his resignation" and then failed to provide Plaintiff with that package; and Plaintiff could have made alternative arrangements with Miller Energy if he had been informed that "that a condition of the finalization of his 'package' was that he be unemployed for some period of time." (Id.)  Plaintiff also points to the record in support of the proposition that others at Defendant EQT knew he was seeking other employment and also expected such conduct from an employee in the situation faced by Plaintiff.  (Id. at 15-16.)  According to Plaintiff, therefore, these issues of fact demonstrate that summary judgment is improper as to his detrimental reliance claim.[16]

### 3.     Whether Defendant EQT is Entitled to Summary Judgment as to Count V of the Second Amended Complaint

---

[16] In reply, Defendants state that even if there had been a representation to him that he would receive a "package" upon his exit from employment with Defendant EQT, Plaintiff cannot show that such a promise is sufficiently specific for purposes of a detrimental reliance claim under Pennsylvania law.  (Doc. No. 54 at 9) (stating that "Pennsylvania law is clear that a broad or vague implied promise is not sufficient to support a detrimental reliance claim" (internal quotation marks omitted)).  To that end, Defendants state that any promise by Mr. Crawford to Plaintiff as to a severance package "does not provide [Plaintiff] with any clarity as to the timing of the 'package,' what the 'package' would consist of, or how the 'package' would be calculated[,]" adding that "[i]ndeed, [Plaintiff] acknowledges that he 'did not know the details' and that there 'was no clarity around the details.'"  (Id. at 10.)

The Court concludes that summary judgment is also improper as to Plaintiff's detrimental reliance claim asserted at Count V of the second amended complaint because Plaintiff has proffered sufficient evidence of record that would permit a reasonable factfinder to conclude that the elements of detrimental reliance have been satisfied. Indeed, there is evidence suggestive of some type of promise by Mr. Crawford toward Plaintiff about his receipt of a severance package (Doc. No. 44-1 at 17:19-25), and one could find that Plaintiff reasonably expected to receive such a benefit in light of the fact that he purportedly discussed this topic with Mr. Crawford on multiple occasions (id. at 19:6-16). One could also reasonably find that Plaintiff sought employment elsewhere on the belief that, if he were not going to be named to a CFO position with Defendant EQT, he would leave the company and receive severance payments (Doc. No. 50-2 at 6:9-22),[17] and that Defendant EQT's withholding of such payment would be unjust. See Burton, 502 F. Supp. 2d at 438-49 (quoting C&K Petroleum Prods., 839 F.2d at 192) (reciting the elements of a claim for detrimental reliance). Further, the Court rejects Defendants' assertion that, even if the requisite "promise" had been made to Plaintiff, such a promise is insufficient for purposes of succeeding on a detrimental reliance claim (Doc. No. 54 at 9) because there is evidence of record suggesting that the "promise" at issue was made in the course of multiple exchanges between Plaintiff and Mr. Crawford, as well as Defendant EQT's officers, rather than in the context of an isolated instance. The Court finds that, in light of the relevant evidence of record, this case is not one characterized by an absence of evidence to support the alleged promise. See Ankerstjerne v. Schlumberger, Ltd., 155 F. App'x 48, 51 (3d Cir. 2005) (affirming the district court's grant of summary judgment to the defendant as to the plaintiff's promissory

_____

[17] A conclusion that Plaintiff may potentially satisfy the "reasonableness" element finds further support in Mr. Porges' testimony that he would generally expect one to be seeking employment following a departure from employment with Defendant EQT. (Doc. No. 50-2 at 6:9-19.)

estoppel claim where the alleged promise was "too vague and indefinite").[18]  Moreover, to the

extent that Plaintiff's ability to prevail as to this element is questionable, the Court finds such a

determination inappropriate for summary judgment, where the Court is obligated to view the

facts in a light most favorable to Plaintiff, the non-movant.  See Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 262 n.2 (1986) (acknowledging the general principle that "all evidence must be

construed in the light most favorable to the party opposing summary judgment").  Accordingly,

the Court will deny Defendants' motion as to Count V of the second amended complaint.

## IV.    CONCLUSION

For the reasons explained above, the Court will grant in part and deny in part Defendants'

motion.  (Doc. No. 41.)  An appropriate Order follows.[19]

---

[18] The Court finds that, unlike the purported promise in Ankerstjerne, where an employee informed the plaintiff – who had not received compensation in exchange for completing a specific project – that he "would get [the compensation issue] taken care of" per the employee's compensation plan, see Ankerstjerne, 155 F. App'x at 51, the alleged promise in this case is sufficient to permit a denial of Defendants' motion because Mr. Crawford, who was aware of Plaintiff's desire to become a CFO generally, is alleged to have told Plaintiff he would "package him out" in the event he left employment with Defendant EQT.  Moreover, to the extent there is inconsistent testimony between Mr. Crawford and Plaintiff regarding the meaning of the term "package out" and the manner in which it was communicated to Plaintiff, the resolution of such an issue rests on a credibility determination that precludes summary judgment.

[19] The Court is cognizant of the fact that Plaintiff generally demands a jury trial on each of the claims asserted in his second amended complaint "to the extent permitted by law."  (Doc. No. 19 at 3.)  While Plaintiff has asserted various state law claims for which there is a right to a jury trial, the Court observes that as to Plaintiff's claim under Section 502(a)(1)(B) of ERISA, asserted at Count I, Plaintiff does not have a right to a jury trial on this claim.  See Zinman v. Prudential Ins. Co. of Am., 909 F. Supp. 279, 281 (E.D. Pa. 1995) (stating that "[t]he Third Circuit has held that claims pursuant to [Section] 502(a)(1)(B) of ERISA are equitable" and "[t]herefore, under the law as interpreted by the Third Circuit, [the] plaintiff has no constitutionally protected right to a jury trial" (citing Pane v. RCA Corp., 868 F.2d 631, 636 (3d Cir. 1989); Turner v. CF & I Steel Corp., 770 F.2d 43, 47 (3d Cir. 1985))).  Accordingly, in light of the fact that the Court has permitted Plaintiff to proceed with his Section 502(a)(1)(B) claim – which does not have a corresponding right to a jury trial – as well as his state law claims – to which a right to a jury trial does attach – the Court will direct the filing of a status report clarifying whether Plaintiff intends to a pursue a jury trial as to his state law claims.